**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FIREMAN'S FUND INSURANCE COMPANY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07 C 647 |
| | ) | |
| AMSTEK METAL, LLC, and P.J. WALLBANK | ) | Judge Rebecca R. Pallmeyer |
| SPRINGS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Amstek Metal, LLC ("Amstek") buys and sells wire. P.J. Wallbank Springs, Inc. ("Wallbank") bought wire from Amstek, made springs from the wire, and incorporated those springs into transmission spring packs for its customers, including General Motors ("GM"). The springs began to break, however, and GM returned the transmission spring packs to Wallbank. Wallbank claims the spring breakage resulted from Amstek's providing defective wire, and filed a lawsuit against Amstek for breach of contract and warranties (the "underlying litigation"). In the case before this court, Plaintiff Fireman's Fund Insurance Company ("FFIC") seeks a declaratory judgment that it has no duty to defend or indemnify Amstek, its insured, in the underlying litigation. Both parties have moved for summary judgment on the issue of duty to defend. For the reasons explained below, the court grants Amstek's motion, denies FFIC's motion, and stays Amstek's claim for indemnification pending resolution of the underlying dispute between Amstek and Wallbank.

## FACTUAL BACKGROUND

The following facts are taken from the parties' Local Rule 56.1 Statements: FFIC's Statement of Material Facts ("FFIC 56.1"); Amstek's Statement of Undisputed Material Facts ("Amstek 56.1"); and FFIC's Response to Amstek 56.1 ("FFIC 56.1 Resp."). Amstek did not file a Rule 56.1(b)(3)(A) statement in opposition to the FFIC 56.1. Thus, Amstek has admitted any facts

in the FFIC 56.1 that are not specifically refuted in its own Rule 56.1 Statement.  N.D. Ill. R. 56.1(b)(3)(C).

Before setting forth the facts, the court must resolve a preliminary dispute concerning the scope of the record.  FFIC argues that certain exhibits Amstek filed in support of its Motion for Summary Judgment should be stricken because they fall outside the four corners of the complaint filed in the underlying lawsuit, *P.J. Wallbank Springs, Inc. v. Amstek Metal, LLC*, Case No. 06002864-CK (Mich. Cir. Ct.) (the "Wallbank Complaint").  Under Illinois law, "because the duty to defend is gauged by the allegations of the complaint, what the facts subsequently show is immaterial."  *Carr v. Vogelzang (In re Country Mut. Ins. Co.)*, __ Ill.2d __, 889 N.E.2d 209, 209 (2007). According to FFIC, the only exception to this rule is that true but unpleaded facts known to the insurer may be admissible to assess the insurer's duty to defend.  (FFIC Resp. to Amstek Mot. at 5.)  As this court understands the "true but unpleaded facts" exception, however, it is not so narrow.

The First District Illinois Appellate Court has recently addressed the "true but unpleaded facts" exception in some depth.  *Am. Econ. Ins. Co. v. Holabird & Root*, __ Ill. App. 3d __, 886 N.E.2d 1166 (1st Dist. 2008).  The court concluded that, when determining an insured's duty to defend, the trial court may sometimes consider evidence outside the underlying complaint.  *Id.* at 1172; *see also Fremont Compensation Ins. Co. v. Ace-Chicago Great Dane Corp.*, 304 Ill. App. 3d 734, 742, 710 N.E.2d 132, 138 (1st Dist. 1999) (rejecting the notion that "a court, in a declaratory judgment proceeding where an insurer's duty to defend is at issue, may never look beyond the allegations of the underlying complaint"); *West Bend Mut. Ins. Co. v. Sundance Homes, Inc.*, 238 Ill. App. 3d 335, 338, 606 N.E.2d 326, 328 (1st Dist. 1992) ("though the action at bar is for declaratory judgment, the court 'need not wear judicial blinders' and may look beyond the complaint at other evidence appropriate to a motion for summary judgment (for example, the statements of [underlying plaintiff's] co-workers as well as the third-party complaint against [insured]") (internal

quotation marks and citations omitted). In *Holabird*, the underlying plaintiff, claiming to have been injured by exposure to fluorescent lighting, filed suit against three defendants: DePaul University, L&L Engineers, and Holabird. 886 N.E.2d 1166 at 1168. Holabird tendered its defense to American Economy, who was the insurer for the electrical subcontractor that Holabird hired when working on the building. *Id.* In the resulting coverage action, the trial court granted Holabird summary judgment on the duty to defend issue. *Id.* American Economy appealed, arguing that the underlying complaint made no mention of its insured, and that the trial court improperly relied on a third-party complaint filed by DePaul when making its determination; it was that third-party complaint that named American Economy's insured as the installer of the fluorescent lighting in question. *Id.* at 1172. After a thorough consideration of Illinois law regarding the "true but unpleaded facts" doctrine, the First District concluded "that consideration of a third-party complaint in determining a duty to defend is in line with the general rule that a trial court may consider evidence beyond the underlying complaint if in doing so the trial court does not determine an issue critical to the underlying action." *Id.* at 1178. Ultimately, the court found that American Economy had a duty to defend, based on its consideration of the relevant insurance policy, the underlying complaint, and the third-party complaint. *Id.*[1]

The *Holabird* court relied on a number of cases in reaching this decision, one of which is particularly relevant here. In *Ace-Chicago*, the First District approved consideration of deposition testimony in a coverage dispute. 304 Ill. App. 3d at 743-4, 710 N.E.2d at 139. There, the underlying plaintiff filed suit for injuries he suffered from falling off a ladder; four years later, he amended his complaint to add a negligent spoliation of evidence claim against Ace-Chicago, the insured, related to the ladder in question. *Id.* at 736, 710 N.E.2d at 134-5. Ace tendered defense

---

[1] The First District reaffirmed this ruling when asked to construe the same insurer's duty to defend another defendant in the same underlying litigation. *Am. Econ. Ins. Co. v. DePaul Univ.*, __ Ill. App. 3d __, 890 N.E.2d 582 (1st Dist. 2008).

to its insurers, one of whom (Potomac) moved to dismiss. *Id.* at 737, 710 N.E.2d at 135. In its motion, Potomac argued that Ace had failed to demonstrate that the spoliation was due to an occurrence within the policy period; according to Potomac, deposition testimony taken in the underlying lawsuit established that the ladder was not destroyed until the policy period had expired. *Id.* Based on the deposition testimony, the court found that the spoliation could not have occurred within the policy period and dismissed the coverage claim. *Id.* at 744, 710 N.E.2d at 139. The court deemed it proper to consider the deposition testimony because determining whether coverage exists for the spoliation claim did not resolve any dispute in the underlying action. *Id.* at 743, 710 N.E.2d at 139.

Thus, this court will consider true but unpleaded facts–including those contained in a declaration from Melvyn Wallbank regarding the Amstek wire and Wallbank springs manufactured from it–to the extent it is able to do so without "decid[ing] an ultimate fact of the underlying action." *Holabird*, 886 N.E.2d at 1174; *Ace-Chicago*, 304 Ill. App. 3d at 742; 710 N.E.2d at 138.

## I.      Parties

FFIC is a California insurance company with its principal place of business in California. (FFIC 56.1 ¶ 1.) Amstek is an Illinois limited liability company, with its principal place of business in Illinois. (*Id.* ¶ 2.) No member of Amstek is a California citizen. (2d Am. Compl. ¶ 3; Ans. ¶ 3.) Wallbank is a Michigan corporation with its principal place of business in Michigan. (FFIC 56.1 ¶ 4.) Because Wallbank seeks damages from Amstek in excess of $700,000 in the underlying litigation, this court has diversity jurisdiction over the parties' coverage dispute. (*Id.* ¶ 5.)

## II.      The Underlying Dispute

Amstek is in the business of buying and selling wire. (Amstek 56.1 ¶ 8.) According to Wallbank's lawsuit, Wallbank and Amstek executed a Blanket Purchase Order in March 2005. (Wallbank Compl. ¶ 5, Ex. A to FFIC 56.1.) Pursuant to that agreement, in June 2005, Amstek supplied Wallbank with steel wire to be used in spring assemblies. (Amstek 56.1 ¶ 9; Wallbank

Compl. ¶ 12.)    Melvyn Wallbank, Wallbank's President and CEO, explains that Wallbank manufactures spring packs (a combination of springs with brackets affixed on either end) that it sells to companies such as GM and Ford for use in automatic transmission clutches. (Decl. of Melvyn Wallbank dated 2/4/08 ("Wallbank Decl.") ¶¶ 1-2, 4, Ex. B to Amstek Mem.) Mr. Wallbank attests that, to create springs, Wallbank "cold-works" the wire it purchases.[2] (*Id.* ¶ 4.) Then, according to Mr. Wallbank, Wallbank uses electrical current to relieve the stress in the springs. (*Id.*) Finally, Wallbank assembles these springs into transmission spring packs for sale. (*Id.*) FFIC urges the court not to consider Mr. Wallbank's Declaration, but it acknowledges that Wallbank manufactured and sold "spring assemblies" using Amstek's wire. (FFIC 56.1 Resp. ¶ 10.) According to Mr. Wallbank, in June 2006, a GM division discovered that some of the springs in Wallbank's transmission spring packs were breaking, rejected those spring packs, and returned them to Wallbank. (Wallbank Decl. ¶¶ 6-7.) Later that month, Wallbank learned it was that the wire Amstek provided that caused the springs within the spring assembly packs to break. (Wallbank Compl. ¶ 13.) Wallbank notified Amstek of the spring breakage in July 2006 and directed Amstek to stop shipping wire. (*Id.* ¶ 14.)

On November 15, 2006, Wallbank filed suit against Amstek in Michigan state court, alleging breach of contract, breach of express and implied warranties, rejection of goods, and revocation of acceptance. (Wallbank Compl.) More specifically, Wallbank alleges that the Amstek wire did not function as required by the purchase agreement, in that it broke frequently when used in springs. (*Id.* ¶ 24.) Wallbank seeks equitable relief and more than $700,000 in damages, including losses attributable to GM's rejection of Wallbank's spring assemblies, freight charges, scrapped parts that were manufactured but not delivered to GM, laboratory fees, and sorting costs. (*Id.* at 7, ¶ 38.) In other words, Wallbank asserts that it suffered a variety of damages because it was

---

[2]        The parties have not further explained what this process entails.

forced to discard broken spring packs, manufacture new ones, and incur related expenses. The Michigan state court lawsuit remains ongoing. (Amstek 56.1 ¶ 14.)

## III.    Insurance Coverage Dispute

This action involves only insurance coverage claims. FFIC issued a Commercial General Liability ("CGL") insurance policy, No. S64 MZX 80844847 (the "Policy"), to Amstek, which provided coverage for the period from July 1, 2005 through July 1, 2006. (FFIC 56.1 ¶ 16; Policy, Ex. B to FFIC 56.1.) The parties do not make clear when Amstek submitted a claim for coverage under the Policy, but FFIC's claims department initially concluded: "IT APPEARS BASED ON THE COMPLAINT THAT <u>THE DAMAGE IS A RESULT OF THE LOSS OF USE OF THESE SPRINGS IN THE TRANSMISSIONS</u>. . .THE COSTS ASSOCIATED WITH REPLACING THE SPRINGS, ETC. <u>THIS WOULD FIT THE DEFINITION OF PROPERTY DAMAGE</u> AS IT IS LOSS OF USE OF TANGIBLE PROPERTY THAT IS NOT PHYSICALLY INJURED." (Notes dated 11/16/06, Ex. G to Def.'s Mot. (emphasis in original).) The notes further conclude that "<u>WE HAVE PROPERTY DAMAGE</u> WHICH WOULD BRING US TO THE EXCLUSIONS UNDER THE POLICY. . ." (*Id.* (emphasis in original).)[3] The document then lists two potential exclusions (exclusion k and exclusion m) but appears to take no position on their applicability. (*Id.*) Despite this initial conclusion, on some unspecified date FFIC disclaimed any duty to defend or indemnify Amstek in the underlying lawsuit (Amstek 56.1 ¶ 16), contending that there has been no property damage and that exclusions k, m, or n obviate its duty to defend.

In the Policy, FFIC committed to "pay those sums that the insured becomes legally obligated to pay as damages because of **bodily injury** or **property damage** to which this insurance applies."

_____

[3]    In its Local Rule 56.1 Response, FFIC denies that "its internal review of the Amstek claim for coverage and defense . . . concluded that the PJ Wallbank complaint did allege 'property damage' caused by an 'occurrence.'" (FFIC 56.1 Resp. ¶ 15.) But FFIC fails to explain the basis for its denial of this fact in Amstek's Local Rule 56.1 Statement or to provide any documentation contradicting or undermining the authenticity of the notes. Its denial thus fails to satisfy the requirements of Rule 56.1, and the court disregards it.

(Policy at Section I, § 1a (emphasis in original for all quoted Policy terms).) The Policy affords FFIC the right and duty to defend Amstek against any suit seeking such damages, but explicitly limits that right and duty to claims to which the insurance does apply. (*Id.*) No party contends that the Wallbank litigation triggers the bodily injury coverage. The Policy defines property damage as follows:

> **Property damage** means:
>
> a.      Physical injury to tangible property, including all resulting loss of use of that property . . . ; or
>
> b.      Loss of use of tangible property that is not physically injured. . . .

(*Id.* at Section V, § 17.) FFIC argues that, under Illinois law, it has no duty to defend Amstek in the underlying lawsuit, because Wallbank seeks damages accrued from the repair and replacement of a defective product. In addition, the Policy only covers property damage that is "caused by an **occurrence** that takes place in the **coverage territory**," that "occurs during the policy period," and that was not known to have occurred in whole or in part prior to the policy period. (*Id.* at Section I, § 1b.) An occurrence is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at Section V, § 13.) According to FFIC, Wallbank's Complaint fails to allege an "occurrence" within the Policy's terms.

In addition, FFIC contends that three Policy exclusions preclude coverage for Amstek. First, FFIC invokes the "Your Product" exclusion: under the Policy's exclusion k, "**Property damage** to **your product** arising out of it or any part of it" is excluded from coverage. (Policy at Section I, § 2k.) "Your product" is defined to include "[a]ny goods or products . . . manufactured, sold, handled, distributed or disposed of by" Amstek, someone trading under Amstek's name, or an entity whose business assets Amstek has acquired as well as certain accompanying equipment. (*Id.* at Section 5, § 21a.)

Next, FFIC invokes exclusion m, the "Impaired Property" exclusion. That exclusion applies

to "[p]roperty damage to impaired property" arising from "(1) [a] defect, deficiency, inadequacy, or dangerous condition in your product. . . ; or (2) [a]. . . failure by you . . . to perform a contract or agreement in accordance with its terms." (Policy at Section I, § 2m.) The Policy defines impaired property to include "tangible property, other than your product . . . that cannot be used or is less useful because: a. It incorporates your product . . . that is known or thought to be defective, deficient, inadequate or dangerous; or b. You have failed to fulfill the terms of a contract or agreement." (*Id.* at Section V, § 8.) Something is considered "impaired property" only if it can be restored to use by "repair, replacement, adjustment or removal of your product. . . ." (*Id.*)

Finally, FFIC contends that exclusion n, the "Sistership" exclusion applies. Pursuant to that exclusion, there is no coverage for

> [d]amages claimed for any loss, costs or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
>
> (1) **Your product;**
>
> (2) **Your work;** or
>
> (3) **Impaired property;**
>
> if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

(Policy at Section I, § 2n.) According to FFIC, all three exclusions relieve its obligation to defend and indemnify Amstek in the underlying litigation.

## DISCUSSION

### I. Legal Standard

Interpretation of an unambiguous insurance policy is a question of law. *First Ins. Funding Corp. v. Fed. Ins. Co.*, 284 F.3d 799, 804 (7th Cir. 2002). Because the court's jurisdiction is based on diversity, state law determines the scope of insurance coverage. *Native Am. Arts, Inc. v. Hartford Cas. Ins. Co.*, 435 F.3d 729, 731 (7th Cir. 2006). Both sides agree that Illinois law governs

this dispute.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *BASF, AG v. Great Am. Assurance Co.*, 522 F.3d 813, 818 (7th Cir. 2008). As Illinois courts have recognized, "the construction of an insurance policy is a question of law which is particularly appropriate for resolution by summary judgment." *Am. Freedom Ins. Co. v. Smith*, 347 Ill. App. 3d 1, 6, 806 N.E.2d 1136, 1139 (1st Dist. 2004). When construing an insurance agreement, Illinois law requires the court "to ascertain and give effect to the true intentions of the contracting parties." *First Ins.*, 284 F.3d at 804. To do so, "the court must look to the allegations in the underlying complaint and compare these allegations to the relevant coverage provisions of the insurance policy." *Native Am.*, 435 F.3d at 732 (quoting *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 393, 620 N.E.2d 1073, 1079 (1993)). The court considers the Policy as a whole "with due regard to the risk undertaken, the subject matter that is insured, and the purpose of the entire contract." *First Ins.*, 284 F.3d at 804 (citation omitted).

"In a duty-to-defend action, we begin with the deck stacked in favor of the insured." *Del Monte Fresh Produce N.A., Inc. v. Transp. Ins. Co.*, 500 F.3d 640, 643 (7th Cir. 2007). Accordingly, FFIC has a duty to defend if the facts of the Wallbank Complaint fall within, "or even potentially within," the Policy's coverage provisions. *Native Am.*, 435 F.3d at 732. Only if "it is clear from the face of the underlying complaint that the allegations set forth in that complaint fail to state facts that bring the case within or potentially within the insured's policy coverage" may the insurer refuse to defend. *Carr*, 889 N.E.2d 209. Moreover, if any part of the Wallbank Complaint falls within the Policy's scope, FFIC must provide a defense. *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1040 (7th Cir. 1992). When deciding whether coverage exists, the court must construe the allegations in the Wallbank Complaint "liberally," resolving any doubt concerning

9

coverage in favor of Amstek, as the insured. *Native Am.*, 435 F.3d at 732. Likewise, to the extent

a contract provision is susceptible to reasonable alternative interpretations, it contains an ambiguity,

and that ambiguity will be resolved in favor of Amstek and against FFIC. *First. Ins.*, 284 F.3d at

804-05. But to the extent the policy terms are unambiguous, the court applies their "plain and

ordinary meaning." *Id.* at 804; *Native Am.*, 435 F.3d at 732.

If Amstek can establish the possibility that coverage exists, FFIC must defend it in the

underlying litigation, unless FFIC proves that the damages Wallbank allegedly suffered are not

covered because of a policy exclusion. *Conn. Specialty Ins. Co. v. Loop Paper Recycling Inc.*, 356

Ill. App. 3d 67, 72, 824 N.E.2d 1125, 1130 (1st Dist. 2005). "The exclusionary clause must be clear

and free from doubt because any doubts as to coverage will be resolved in favor of the insured."

*United Nat'l Ins. Co. v. Fasteel, Inc.*, 550 F. Supp. 2d 814, 826 (N.D. Ill. 2008) (citation and internal

quotation marks omitted).

## II.    Property Damage

The parties first dispute whether the injuries Wallbank alleges in its Complaint constitute

"Property Damage," within the scope of the Policy. As discussed above, FFIC initially concluded

that the Wallbank Complaint alleged damage resulting from loss of use of the springs in Wallbank's

transmission spring packs, and that this injury constituted property damage. (Notes, Ex. G to Def.'s

Mot.) As FFIC's own statement, this conclusion is not hearsay; it is admissible as substantive

evidence against FFIC. FED. R. EVID. 801(d)(2). And having once concluded that the Wallbank

Complaint alleges property damage, FFIC now faces an uphill battle in its attempt to assert that the

allegations in the Wallbank Complaint could not possibly assert property damage. *See BASF*, 522

F.3d at 819 (if allegations in underlying litigation fall potentially within the scope of an insurance

policy, an insurer's duty to defend is triggered). FFIC sets forth two arguments: (1) the only injury

Wallbank alleges is economic loss, *i.e.,* injury to Amstek's own property; and (2) there has been no

occurrence within the meaning of the Policy. Both arguments depend on FFIC's suggestion that

the Wallbank Complaint alleges only that Amstek's wire was damaged, rather than damage to Wallbank's springs or to the transmission spring packs. (FFIC Mem. at 1.) Because the Wallbank Complaint at least potentially asserts damage to products other than the Amstek wire, however, it alleges property damage sufficient to trigger FFIC's duty to defend.

### A. Economic Loss

#### 1. Governing Case Law

Property damage includes "[p]hysical injury to tangible property" and "[l]oss of use of tangible property." (Policy at Section V, § 17.) FFIC contends that the damages alleged in the Wallbank Complaint do not qualify as property damage because they are merely economic loss, in that they do not point to damage to anything other than the Amstek wire. (FFIC Resp. to Amstek Mot. at 6-9.) For this proposition, FFIC relies heavily on *Viking Constr. Mgmt., Inc. v. Liberty Mut. Ins. Co.,* 358 Ill. App. 3d 34, 54, 831 N.E.2d 1, 16 (1st Dist. 2005). There, the underlying plaintiff, a school district, brought breach of contract claims against Viking, relating to Viking's agreement to provide construction management services for the design and construction of a middle school. *Id.* at 36, 2. After portions of an inadequately-braced masonry wall collapsed during the construction, the school district filed suit to recover the cost it incurred to repair and replace that wall. *Id.* at 38, 3-4. Viking sought coverage pursuant to its CGL policy with Liberty Mutual, and the trial court entered a declaratory judgment in favor of Viking on its duty to defend claim. *Id.* at 39, 4. The Illinois appellate court reversed, however, noting that Illinois courts consistently hold that "where the underlying complaint alleges only damages in the nature of repair and replacement of the defective product or construction, such damages constitute economic losses and do not constitute 'property damage.'" *Id.* at 54-55, 16-17. For this, among other reasons, the insurer owed no duty to defend under the Policy's terms. *Id.* at 56, 18.

As FFIC points out, the Seventh Circuit has approved *Viking* as "a sound interpretation of the [standard] CGL policy." *Wausau Underwriters Ins. Co. v. United Plastics Group,* 512 F.3d 953,

956 (7th Cir. 2008). In *Wausau*, the underlying litigation involved a defective component, a plastic water chamber, which United Plastics Group ("UPG") sold to a water heater manufacturer. *Id.* at 955. UPG's component sometimes ruptured, causing the water heater containing it to stop working and, sometimes, to leak. *Id.* In the underlying litigation, UPG was found liable for a total of $26.5 million, including $1.1 million as the cost of repairing and replacing the water heaters, $330,000 in punitive damages, and an award for loss of good will. *Id.* at 955-56. UPG then sought indemnity under a CGL policy with Ohio Casualty. *Id.* at 955. The district court concluded that Ohio Casualty was required to indemnify UPG for the damages assessed, but the Seventh Circuit reversed. *Id.* In that duty to indemnify action, the insured was required to show more than merely that the claims at issue might potentially be covered by the relevant policy. Assessing the facts as ultimately shown at trial, the court noted that the ruptures sometimes damaged the component water chamber, and other times damaged the circuit boards in the water heaters. *Id.* at 956. To the extent the rupture in UPG's water chamber damaged only UPG's component, the court found that "damages resulting from physical damage to the insured's own property are expressly excluded from coverage." *Id.* at 956. The *Wausau* court also noted that this rule tracks the economic loss rule of tort law: where a defect in a seller's property imposes repair or other costs on the purchaser without physically damaging the purchaser's property, the seller is not liable for those costs absent contractual agreement. *Wausau*, 512. F.3d at 957.

### 2. Allegations of the Wallbank Complaint

*Viking, Wausau* and *Tillerson* do not control, however, if the damage extends to a part of Wallbank's product other than the Amstek wire. Here, the Wallbank Complaint suggests that the allegedly defective wire damaged Wallbank's springs and/or spring assembly packs. For example, according to the Wallbank Complaint, the damage at issue results from <u>spring</u> breakage, not wire breakage. (Wallbank Compl. ¶ 13.) The Wallbank Complaint asserts that Amstek's "Wire caused

spring breakage within the spring assemblies manufactured by Wallbank with the Wire," (*id.*), thus expressly distinguishing among the springs, spring assemblies, and Amstek wire. Although the Wallbank Complaint's allegations are factually sparse, Mr. Wallbank's Declaration explains that his company subjected Amstek's wire to a variety of processes and changes in order to convert it to springs. (Wallbank Decl. ¶ 4.) By cold-working the wires to make springs, and then using electrical current to relieve the stress in the springs, Wallbank may have subjected the wire to processes that would need to be repeated in order to repair and replace Amstek's allegedly defective product. Thus, to the extent it alleges spring breakage, the Wallbank Complaint may allege damage to components other than Amstek's wire. *Travelers Ins. Cos. v. Penda Corp.*, 974 F.2d 823, 832 (7th Cir. 1992) (duty to defend triggered where underlying complaint pleaded that the styrene sheets the insured supplied were then varnished, lithographed, supplemented with material swatches, and placed into books, prompting court to conclude that, if the styrene sheets had to be replaced, the varnishing, lithographing, and potentially the appended material swatches might also require replacement).

Furthermore, Wallbank manufactured transmission spring packs, the product Wallbank offers for sale, from the springs it created. As *Wausau* explains, courts distinguish between damage to a defective component (wire) and damage to a final product (transmission spring pack). In fact, when determining whether coverage exists, "the test is whether the damaged property was the property of the insured when the defect on which the insured's liability was based came into being." 512 F.3d at 956. Applying this rule, the court clarified that "UPG manufactured *only* the water chamber. The rest of the heater was therefore other property." *Id.* In other words:

> The *Viking* decision . . . scotches any claim that UPG might have to coverage of its liability for the cost to [the water heater manufacturer] of repairing or replacing any of the defective water chambers (or any other business losses resulting from the sale of the defective heaters), as distinct from the cost of repairing the heaters damaged by the defective water chambers (or other business losses resulting from that damage); only the latter cost arose from damage to property other than the defective product itself.

13

*Id.* at 957.

Similarly, the damaged property at issue may be Wallbank's transmission spring packs. Wallbank's Complaint alleges that the spring breakage compelled it to purchase new steel wire "for Wallbank's manufacturing process," which indicates that it may have been forced to replace not merely the wire or springs but to re-embark on the manufacturing process in order to replace the defective spring assemblies manufactured with that wire. (Wallbank Compl. ¶ 38.) Confirming this, the Wallbank Complaint asserts that Wallbank's damages include "scrapped parts which were manufactured for but not delivered to General Motors," implying that the springs could not be replaced or repaired; the defect appears to have damaged the transmission spring pack irreparably. (*Id.* ¶ 39.) Indeed, Mr. Wallbank has confirmed that "it is not physically possible for PJ Wallbank to repair the rejected spring packs," and that Wallbank was forced to discard those spring packs altogether. (Wallbank Decl. ¶ 8.) To the extent that inclusion of a defective component resulted in harm to Wallbank's final product, property damage has at least potentially occurred. *See Penda*, 974 F.2d at 832 ("Illinois cases also indicate that, when a defective product is 'so intertwined with the entire mechanism that the defect and [its] subsequent removal necessarily resulted in damage to the completed product,' property damage occurs for the purposes of a general liability policy.") (citation omitted). Accordingly, the repair and replacement doctrine does not obviate FFIC's duty to defend.

**B.     Occurrence**

The Policy limits coverage to property damage that is "caused by an **occurrence**," which is defined to include "an accident." (Policy at Section V, §§ 1b, 13.) According to FFIC, Wallbank's Complaint fails to allege an accident because it complains only of negligent manufacture. (FFIC Mem. at 7-8.) Again relying heavily on *Viking*, FFIC argues that, to trigger coverage, an occurrence must involve more than merely damage to Amstek's product itself.

14

To determine whether the property damage was caused by an occurrence, the *Viking* court defined an "accident" (which is not a defined term in the Policy) to include "an unforeseen occurrence, usually of an untoward or disastrous character or an undesigned sudden or unexpected event of an inflictive or unfortunate character." *Viking*, 358 Ill. App. 3d at 42, 831 N.E.2d at 6 (citation omitted). The Seventh Circuit agrees, noting that the meaning of "accident" is illuminated by the CGL policy's exclusion a, which bars coverage for property damage that the insured "expected or intended." *Wausau*, 512 F.3d at 956; *see also Stoneridge Dev. Co. v. Essex Ins. Co.*, 382 Ill. App. 3d 731, 888 N.E.2d 633, 650-51 (2d Dist. 2008). Building on this principle, in faulty construction cases, insurance coverage is not available if the damages at issue resulted from the "natural and ordinary consequences of improper construction methods." *Id.* at 652-53. Analyzing the "occurrence" requirement, the Second District held that this rule reflects that CGL policies

> are intended to protect the insured from liability for injury or damage to the persons or property of others; they are not intended to pay the costs associated with repairing or replacing the insured's defective work and products, which are purely economic losses. [Citations.] Finding coverage for the cost of replacing or repairing defective work would transform the policy into something akin to a performance bond.

*Id.* at 653 (quoting *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 197 Ill. 2d 278, 289, 757 N.E.2d 481, 489 (2001)) (additional citations omitted). Converting an insurance policy to a performance bond would require the insurer to insure against faulty workmanship without permitting the insurer the right, enjoyed by the surety on a performance bond, to recover against the contractor for the defective work. *Id.* Here, while the Wallbank Complaint alleges that Amstek provided defective wire, it does not explicitly allege that Amstek was negligent. Of course, it is possible that Amstek did act negligently in providing Wallbank with defective wire. But it would be improper for the court to resolve this question here, because an insurer must defend its client if the facts alleged are even potentially within the policy coverage. *Carr*, 889 N.E.2d at 209-10. Instead, FFIC may raise its negligent manufacture claim in litigating its duty to indemnify.

Furthermore, although *Viking* establishes that, generally, a CGL policy does not cover a general contractor's claim for breach of contract in construction cases, 358 Ill. App. 2d at 42, 831 N.E.2d at 6, other courts suggest that there are exceptions to this general rule. Most recently, the *Stoneridge* court made clear that a construction defect that damages something other than the project itself can constitute an "occurrence." 888 N.E.2d at 653. Courts draw the same distinction in the context of component parts. For example, where a hospital sued an insured x-ray supplier for supplying a defective x-ray suite, the court found that no occurrence had been alleged. *Continental X-Ray Corp. v. Home Indem. Co.*, No. 96 C 5250, 1997 WL 102537, at *4 (N.D. Ill. Mar. 5, 1997). An accident must involve "unforeseen and unexpected" events, so mere allegations that a product did not perform as expected are not sufficient. *Id.* The *Continental* court noted, however, that "if an insured's defective product has been integrated into a larger mechanism, and that defect results in damage to the completed product, property damage occurs for the purposes of a commercial general liability policy." *Id.* at *5 (citing *Penda*, 974 F.2d at 831).

Apparently acknowledging this exception, FFIC contends that the Wallbank complaint "simply alleges that the wire supplied by Amstek broke because it was unfit for its intended purpose and did not conform to the specifications required by Wallbank." (FFIC Mem. at 8.) The court disagrees. As explained above, it is at least potentially true that Wallbank's Complaint alleges that the springs or transmission spring packs were damaged by Amstek's allegedly defective wire. This might constitute an accident, or occurrence. Thus, the court reaches the same conclusion that FFIC's claims department did, initially: FFIC has a duty to defend the claim by Amstek, unless FFIC can prove that one of the exclusions for coverage applies.

## III.    Exclusions

According to FFIC, three separate exclusions relieve it of the duty to defend Amstek in the underlying litigation. FFIC bears the burden of proving that the exclusionary clauses are "clear and free from doubt" in their application to this case. *Fasteel*, 550 F. Supp. 2d at 826. Yet in seeking

to invoke each of the claimed exclusions, FFIC relies on the premise that the Wallbank Complaint asserts only that Amstek's wire itself was damaged. Because the Wallbank Complaint at least potentially asserts damage to the springs and/or transmission spring packs, no exclusion clearly and undoubtedly applies in this case.

## A. "Your Product" Exclusion (k)

The "Your Product" exclusion excludes from coverage any damage to Amstek's product that arises from that product or any part of that product. (Policy at Section I, § 2k.) This exclusion eliminates insurance protection "against the insured's own faulty workmanship or product, which are normal risks associated with the conduct of the insured's business." *State Farm Fire and Cas. Co. v. Tillerson,* 334 Ill. App. 3d 404, 411, 777 N.E.2d 986, 992 (5th Dist. 2002) (invoking exclusion k in breach of warranty construction case because only damage alleged was to property on which underlying defendant worked). Amstek's product is defined to include "[a]ny goods or products . . . manufactured, sold, handled, distributed or disposed of by" Amstek. (Policy at Section 5, § 21a.) As explained above, Amstek's product may be considered its wire–not the springs Wallbank created from that wire, or the transmission spring packs into which Wallbank incorporated those springs. Thus, the "Your Product" exclusion does not apply.

Urging otherwise, FFIC points to *Continental*, where the district court refused insurance coverage, instead granting judgment on the pleadings in favor of the insurer. No. 96 C 5250, 1997 WL 102537. That case, as discussed above, involved a faulty x-ray suite, which the court deemed to be the insured's product because the insured could point to no evidence that it should be considered a component. *Id.* at *5. Thus, the court concluded that exclusion k barred coverage. *Id.* at *5. Here, in contrast, Amstek's wire was converted into a spring and then incorporated into a transmission spring pack. The Wallbank Complaint leaves open an inference that Wallbank's springs and spring transmission packs–rather than merely Amstek's wire–were damaged by the occurrence at issue in the underlying litigation. According to Mr. Wallbank, Amstek's wire was

iintertwined with the new Wallbank product by being heated, coiled, and incorporated into a spring pack; a broken piece of Amstek wire cannot simply be removed and repaired from the spring pack when it has taken on a new form. (Wallbank Decl. ¶ 8.) The language in the Wallbank Complaint further highlights the distinction between the Amstek wire and the Wallbank product: "Wallbank discovered that the Wire caused spring breakage within the spring assemblies manufactured by Wallbank." (Wallbank Compl. ¶ 9.) Thus, *Continental* is distinguishable, and it is not clear and free from doubt that the "Your Product" exclusion applies in this case.

**B.    "Impaired Property" Exclusion (m)**

FFIC next contends that the Wallbank spring pack is impaired property, under the Policy's definition. The "Impaired Property" exclusion bars coverage for damage to impaired property that arises from a defect in Amstek's product or Amstek's failure to perform its contract with Wallbank. (Policy at Section I, § 2m.) Impaired property includes property other than Amstek's wire "that cannot be used or is less useful because" it incorporated Amstek's wire, which is "known or thought to be defective, deficient, inadequate or dangerous." (*Id.* at Section V, § 8.) Something is considered "impaired property" only if it can be restored to use by "repair, replacement, adjustment or removal" of Amstek's wire. (*Id.*) As with the "Your Product" exclusion, the "Impaired Property" exclusion is intended to prevent CGL policies from protecting against the insured's own faulty workmanship or product. *Tillerson*, 334 Ill. App. 3d at 411, 777 N.E.2d at 992. Again, however, the court concludes that FFIC has been too restrictive in its characterization of the product at issue in the underlying litigation.

FFIC relies primarily on *Sokol and Co. v. Atlantic Mut. Ins. Co.,* 430 F.3d 417, 423 (7th Cir. 2005), where the Seventh Circuit affirmed summary judgment in favor of the insurer. Sokol had provided peanut butter paste for use in a cookie mix to be sold to the consuming public. *Id.* at 419. After the paste was incorporated into cookie mix boxes and the boxes were shipped to customers, but before the cookie mix boxes were sold to the consuming public, the cookie mix manufacturer

determined that the peanut butter paste was rancid. *Id.* The cookie mix manufacturer therefore retrieved the affected boxes, removed the peanut butter paste, and replaced Sokol's product with peanut butter paste acquired from a different vendor. *Id.* The manufacturer then sued Sokol for the cost of this substitution. *Id.* The court found that the cookie mix was "impaired property" under the CGL policy because the cookie kit distributor was able to replace the packets of peanut butter paste, correct the problem, and re-submit the products to the market. *Id.* at 423.

*Sokol* is distinguishable. The Wallbank Complaint and Mr. Wallbank's Declaration suggest that Wallbank cannot correct the injury to its product by retrieving its transmission spring packs and replacing the Amstek wire. Instead, according to Mr. Wallbank, the break of the metal spring rendered the transmission spring pack irreparable. (Wallbank Decl. ¶ 8.) Furthermore, the damages sought in the Wallbank Complaint include reimbursement for "scrapped parts," underscoring that Wallbank was not able to substitute appropriate wire for Amstek's product. (Wallbank Compl. ¶ 39.) It thus appears that a broken spring pack cannot be restored to use by "repair, replacement, adjustment or removal" of Amstek's wire, as required to satisfy the "Impaired Property" exclusion.[4] FFIC has not carried its burden of proving that it is clear and free from doubt that the "Impaired Property" exclusion applies.

### C. "Sistership" Exclusion (n)

Finally, FFIC argues that it has no duty to defend because the Sistership exclusion has been triggered here. As explained above, that exclusion applies if Amstek's "product" or "impaired property" was withdrawn or recalled from the market due to "a known or suspected defect, inadequacy or dangerous condition in it." (Policy at Section I, § 2n.) Analyzing a similar "sistership" exclusion, one Illinois court held that such clauses are triggered "in cases where, because of the

---

[4] In its motion for summary judgment, Amstek raises the alternative argument that the exclusion cannot apply because the impairment occurred suddenly and accidentally, and the policy considers this an exception to the exclusion. The court need not reach this issue in light of its conclusion that the property in question is not considered impaired.

actual failure of the insured's product, similar products are withdrawn from use to prevent the failure of these other products, which have not yet failed but are suspected of containing the same defect." *United States Fid. & Guar. Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 81, 578 N.E.2d 926, 934 (1991) (citation omitted);[5] *see also Elco Indus., Inc. v. Liberty Mut. Ins. Co.*, 90 Ill. App. 3d 1106, 1110, 414 N.E.2d 41, 45 (1st Dist. 1980) ("It is a common provision in comprehensive liability insurance policies, which is intended to exclude from coverage the cost of preventive or curative action by withdrawal of the product in situations where a danger is to be apprehended.").

Significantly, the *Wilkin* court found that a complaint seeking damages for removal and replacement of a defective product but not the cost of "preventative action" was not affected by the sistership exclusion. 144 Ill. 2d at 81, 578 N.E.2d at 934. Likewise, the "Sistership" exclusion does not bar coverage for inspection, removal, or replacement of a product that has already caused damage. *Int'l Envtl. Corp. v. Nat'l Union Fire Ins. Co.*, 843 F. Supp. 1218, 1229-30 (N.D. Ill. 1993). Wallbank expressly asserts that spring breakage did occur, prompting GM to reject Wallbank's spring assembly packs and demand damages. (Wallbank Compl. ¶¶ 13, 39-40.) In other words, the Wallbank Complaint does not purport to recoup the cost of preventative action but, rather, to recoup the losses it suffered once its product failed. Even if some of Wallbank's or GM's actions were preventative, FFIC's duty to defend is triggered by the action the companies took to remedy breakages that did occur. *See BASF*, 522 F.3d at 819 (insurer had duty to defend "even if only one of several theories of recovery fell within the potential coverage"). In addition, the "majority position" is that the Sistership exclusion applies only where the insured–rather than a third party–initiated withdrawal of the product. *Elco*, 90 Ill. App. 3d at 1110, 414 N.E.2d at 45. Here, Amstek, the

---

[5]   The clause at issue in that case excluded: "Damages claimed for the withdrawal, inspection, repair, replacement or loss of use of the named insured's products or work completed by or for the named insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein." *Wilkin*, 144 Ill.2d at 80, 578 N.E.2d at 933.

insured, did not initiate a recall (to the extent one occurred at all).  For both reasons, the Recall exclusion is not applicable.

FFIC's reliance on *Sokol* to invoke the "Sistership" exclusion is misplaced.  In *Sokol,* the cookie mix manufacturer initiated a recall of its cookie mixes, in order to replace the defective peanut butter packets and, as the Seventh Circuit concluded, the Sistership exclusion applies straightforwardly under those circumstances.  *Sokol,* 430 F.3d at 424.  In other words, its actions were preventative.[6]  Accordingly, FFIC has not shown that the application of the "Sisterhood" exclusion is clear and free from doubt.

## III.    Duty to Indemnify

To the extent that FFIC's declaratory action asks this court to rule on its duty to indemnify Amstek in the underlying litigation, the court does not reach that issue.   An "indemnification issue will become ripe only upon completion of the [underlying] litigation, for its resolution depends upon an analysis of the type of relief, if any, ultimately obtained in [the underlying] suit."  *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1042 (7th Cir. 1992).  Thus, the Seventh Circuit has "warned repeatedly against trying to resolve indemnity before liability."  *Doe v. City of Chicago*, 360 F.3d 667, 672 (7th Cir. 2004).  Heeding that warning, the court declines to resolve questions of indemnity at this stage.

---

[6]      The *Sokol* court did not consider the relevance of a third-party, rather than the insured, initiating the recall.

**CONCLUSION**

Amstek's motion for summary judgment (53) is granted. FFIC's motion for summary judgment (55) is denied. Whether FFIC has a duty to indemnify Amstek will be determined at a later date, following resolution of *P.J. Wallbank Springs, Inc. v. Amstek Metal, LLC*, Case No. 06002864-CK (Mich. Cir. Ct.).

ENTER:

Dated: August 27, 2008

_____
REBECCA R. PALLMEYER
United States District Judge